UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CARLOCITO SLIM,<br><br>Defendant. | 5:17-CR-50126-JLV<br><br>REPORT AND RECOMMENDATION |
|---|---|

Pending is Defendant's Motion to Suppress (Doc. 64). A hearing was held on Wednesday, January 30, 2019. Defendant was personally present and represented by his attorney of record, Terry Pechota. The Government was represented by the Assistant United States Attorney Sarah Collins. Three witnesses testified at the hearing, and two exhibits were received into evidence. Supplemental briefing concluded on May 6, 2019. Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

## **RECOMMENDATION**

It is respectfully recommended that Defendant's Motion to Suppress be denied.

## JURISDICTION

Defendant is charged in a Superseding Indictment with Attempted Commercial Sex Trafficking of a Minor, in violation of 18 U.S.C. §§ 1591(a)(1) and 1594(a), and Attempted Enticement of a Minor Using the Internet, in violation of 18 U.S.C. § 2422(b).  The pending Motion was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Chief Judge Jeffrey L. Viken's Standing Order dated April 1, 2018.

## FACTUAL BACKGROUND

During the Sturgis Bike Rally in August 2017, the South Dakota Division of Criminal Investigation ("DCI") and Internet Crimes Against Children ("ICAC") Task Force performed an operation designed to catch Internet predators.  (Doc. 74 at p. 5).  As part of the undercover operation, DCI Special Agent ("SA") Toby Russell posed as a pimp and posted on classified websites such as Backpage.com and Craigslist.com advertising juveniles for prostitution.  (Id. at p. 6).  SA Russell was the lead case agent on this investigation and testified at the January 30, 2019 evidentiary hearing.  (See id. at p. 61).  The court finds his testimony credible.

Defendant Carlocito Slim allegedly responded to an ad SA Russell placed on Backpage.com.  Defendant and SA Russell negotiated via text message to purchase one hour of sex for $200 with a fictional 15-year-old child.  (Id. at p. 6–7).  As part of the transaction, Defendant agreed to use a condom.  (Id.). Defendant and SA Russell arranged to meet at the Flying J Truck Stop near Interstate 90 in Rapid City, South Dakota, at approximately 9:30 p.m. on

August 10, 2017.  (Id. at p. 6–7).  SA Russell and an arrest team conducted surveillance at the Flying J prior to the arranged meeting time.  (Id. at p. 8). Before arriving at the Flying J, Defendant informed SA Russell that he would be driving a white Chevy car.  (Id. at p. 8).  SA Russell and the arrest team observed a white Chevy car pull into the truck stop parking lot at the agreed-to meeting time, and Defendant sent SA Russell a text message saying he had arrived.  (Id. at p. 9).  The arrest team approached Defendant's vehicle and took him into custody.  (Id. at p. 10).  A Rapid City Police Department squad car transported Defendant directly to the Homeland Security Investigations ("HSI") office in Rapid City.  (Id. at p. 11–12).

SA Russell and another ICAC team member, DCI Special Agent John Barnes, arrived at the HSI office while Defendant was going through the initial booking process.  (Id. at p. 12).   The agents escorted Defendant to the HSI interview room.  (Id.).  At no point during that process did Defendant indicate he was unwilling to cooperate with law enforcement.  (Id.).  Both SA Russell and SA Barnes remained in the room with Defendant during the interview, although only SA Russell asked questions.  (Ex. 1).  SA Russell testified that Defendant appeared calm, acted in a cooperative manner, appeared to understand the agents' questions, and showed no signs of being under the influence of any drugs or alcohol.  (Doc. 74 at p. 12–13).  SA Russell additionally testified that neither he nor any other agent made any threats or promises to Defendant, nor tried to trick Defendant in any way.  (Id. at p. 13–15).

The interview room measured approximately 8 feet by 10 feet and was large enough for the two agents and Defendant to sit comfortably. (Id. at p. 19; Ex. 1). Defendant was dressed in street clothes and was not restrained. (Ex. 1). The agents left the door ajar when they entered the room with Defendant. (Id.). SA Russell sat at a small table with Defendant, and SA Barnes sat farther away from the table. (Id.). No other law enforcement officers were present during the interview. (Id.). The agents were dressed in street clothes and their weapons were concealed. (Doc. 74 at p. 19). Defendant did not appear overly nervous during the interview, and gave quick, clear, and coherent responses to SA Russell's questions. (Ex. 1).

SA Russell asked Defendant questions about his residence, place of employment, and identifying information, and then advised Defendant of his Miranda rights. (Id. at 22:15:40). SA Russell informed Defendant that he was not free to leave, read each Miranda right clearly, and asked Defendant if he wished to waive those rights and speak to the agents. Defendant stated he wished to waive his rights and speak with the agents. (Id. at 22:16:00). Throughout the interview, Defendant was responsive, alert, and did not appear tired or confused. (See generally id.). SA Russell spoke in a calm tone; Defendant spoke casually and laughed several times during the interview, indicating he felt comfortable. (Id. at 22:19:50; 22:22:35; 22:23:40; 22:24:15). After completing questioning, Defendant agreed that SA Russell made no threats or promises; the statements were made of Defendant's own free will; and Defendant did not wish to change or add anything in his statement. (Id. at

22:36:10–22:36:30).  Defendant was then booked into the Pennington County
Jail.  (Doc. 74 at p. 17).  The interview lasted approximately 26 minutes,
terminating at approximately 10:37 p.m.  (Ex. 1; Doc. 74 at p. 19).

After Defendant was removed from his vehicle and transported off the
scene, other ICAC officers conducted an inventory search of Defendant's car.
(Doc. 74 at p. 59).  Rapid City Police Department Detective Jeremy Stauffacher
participated in the search of the vehicle and testified at the January 30, 2019
evidentiary hearing.  The court finds his testimony credible.

Det. Stauffacher testified that the South Dakota Division of Criminal
Investigation follows a standard inventory search procedure regarding towing
and impounding vehicles when the sole occupant has been arrested.  (Id. at p.
59).  The government did not introduce the written protocol into evidence.
However, Det. Stauffacher testified that under DCI's procedure, officers must
first do an inventory search of the vehicle and document all valuables in case
anything disappears after the vehicle is towed, and then tow and impound the
vehicle.  (Id. at p. 59–60).  This policy was in effect in 2017 when Defendant
was arrested.  (Id. at p. 65).  While conducting the inventory search of
Defendant's vehicle, Det. Stauffacher took photographs and found $200 in
cash on the driver's seat, a box of condoms in the center console cup tray, an
individual condom on the driver's seat, one cell phone on the floorboard of the
front passenger seat, and one cell phone inside the center console
compartment.  (Id. at p. 56–59).  Det. Stauffacher checked these items into
evidence.  (Id. at p. 59).

5

ICAC Supervisory Special Agent ("SA") Brent Gromer supervised the arrest of Defendant at the Flying J, and was present during the vehicle search. (Id. at p. 65–66). The court finds his testimony credible. SA Gromer was aware of the nature of the communications between Defendant and SA Russell before the arrest took place. (Id. at p. 66). After Defendant was arrested, SA Gromer supervised and assisted with the inventory search. (Id. at p. 67). SA Gromer testified that DCI requires an inventory search before towing the vehicle, with all the contents being noted in an inventory. (Id. at p. 65). The government did not present evidence of a completed inventory log. When the search team found Defendant's cell phone in the vehicle, SA Gromer powered on the phone, accessed the phone's text messaging application, and viewed a preview of the listed text messages to confirm that the arrested individual was indeed the person with whom SA Russell had been communicating. (Id. at p. 68–69). SA Gromer did not open any of the individual messages. (Id. at p. 69). Because SA Gromer knew what messages SA Russell had sent, he was able to confirm that Defendant had been communicating with SA Russell. (Id.). After viewing the messages, SA Gromer placed the phone in airplane mode, powered it off, and placed it back in Defendant's vehicle to be collected during the inventory search. (Id.).

The following day, on August 11, 2017, the undersigned federal magistrate judge issued a complaint charging Defendant with Attempted Enticement of a Minor Using the Internet, in violation of 18 U.S.C. § 2422(b). (Doc. 1). On August 16, 2017, HSI SA Michael Diaz applied for a search

6

warrant to search the two phones that were found in Defendant's vehicle during the inventory search. (Doc. 74 at p. 68–69; Doc. 70-1 at p. 1). The probable cause statement in the affidavit omitted SA Gromer's observations during the vehicle search and did not mention the fact that SA Gromer accessed Defendant's phone. (Doc. 70-1 at p. 17–18). The affidavit instead established a link between Defendant and the cell phones by stating that Defendant had the subject devices in his possession and admitted to texting SA Russell about purchasing an hour of sex for $200 with a fifteen-year-old female. (Id.). The magistrate judge issued the search warrant. (Id. at p. 2).

## DISCUSSION

Defendant argues his statements in the August 10, 2017 interview were involuntarily made and should be suppressed. Defendant additionally argues agents conducted warrantless searches of his vehicle and cell phone, and all evidence seized pursuant to those searches should be suppressed. (Doc. 64 at p. 1–3). Although Defendant argued in his initial motion that he was not properly read his Miranda rights before being interrogated, Defendant withdrew this position at the January 30, 2019 evidentiary hearing.

## I. Whether Defendant's statements were involuntary

Defendant argues that his interview with SA Russell on August 10, 2017 was involuntary and should be suppressed in full. (Doc. 64 at p. 1–3; Doc. 80 at p. 4–5). The government responds that Defendant possessed sufficient faculties to resist the pressure to confess, and his statements were voluntary. (Doc. 70 at p. 6; Doc. 77 at p. 7)

7

"Due process requires that confessions be voluntary." United States v. Anaya, 715 F. Supp. 2d 916, 931 (D.S.D. 2010) (citing Brown v. Mississippi, 297 U.S. 278, 285–86 (1936)).  "The appropriate test for determining the voluntariness of a confession is 'whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will.'" United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir. 1990) (quoting United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir. 1989)).  A statement is voluntary if it is "the product of an essentially free and unconstrained choice by its maker." Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973).  "On the other hand, a statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." LeBrun, 363 F.3d at 724.  The government bears the burden of showing by a preponderance of the evidence that the challenged statements were voluntary.  United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004).

When assessing whether the defendant's will was overborne, the court considers "the conduct of the officers and the characteristics of the accused." LeBrun, 363 F.3d at 724.  Relevant factors include the defendant's prior experience with law enforcement; the nature of the interrogation, including its duration and location; whether the defendant was in custody or otherwise restrained; whether law enforcement employed hostile tactics; and defendant's intelligence and mental state.  See, e.g., id. at 726; United States v. Turner, 157 F.3d 552, 555–56 (8th Cir. 1998).

8

Low intelligence or impaired mental functioning are not determinative of voluntariness without some evidence of coercive police activity. <u>Colorado v. Connelly</u>, 479 U.S. 157, 165 (1986) ("A statement rendered by [a mentally incompetent individual] might be proved to be quite unreliable, but this is a matter to be governed by the evidentiary laws of the forum . . . and not by the Due Process Clause[.]"); <u>United States v. Turner</u>, 157 F.3d 552, 555 (8th Cir. 1998) (finding confession voluntary where defendant "was clearly intelligent to understand his rights" even though he was intoxicated with PCP at time of confession and his IQ was in "low-average to borderline range").

"A statement cannot be rendered involuntary by the incapacity of the defendant alone; there must be some coercive police activity." <u>Anaya</u>, 715 F. Supp. 2d at 931–32 (citing <u>Colorado v. Connelly</u>, 479 U.S. 157, 164, 167 (1986)). "It is improper for a police officer to obtain a confession through an express or implied promise of leniency." <u>Smith v. Bowersox</u>, 311 F.3d 915, 922 (8th Cir. 2002). However, officers may "elicit confessions through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices." <u>United States v. Brave Heart</u>, 397 F.3d 1035, 1041 (8th Cir. 2005) (citing <u>Astello</u>, 241 F.3d at 967–68); <u>see</u> <u>Simmons</u>, 235 F.3d at 1132–33 (where three officers interrogated a 17–year–old habeas petitioner with below-average intelligence for over two hours, raising their voices in close proximity, making misrepresentations, and "telling him things would go better for him if he told

9

the truth," court found that habeas petitioner did not prove that his will was overborne by police); <u>Jenner v. Smith</u>, 982 F.2d 329, 334 (8th Cir. 1993) (where officers interviewed habeas petitioner for six to seven hours, used questioning techniques that referenced a "bad Debbie" who was responsible, raised their voices, and accused defendant of not being honest, the court found that habeas petitioner did not prove that her will was overborne by police); <u>United States v. Running</u>, 698 F. Supp. 2d 1186, 1196 (D.S.D. 2009) (where agent was taller and heavier than defendant, did not counsel defendant he could later be arrested, and told defendant it would be dishonorable for a Native American Marine to force a young girl to go through court proceedings, defendant failed to show his will was overborne).

Defendant does not identify any specific impairment that rendered him particularly susceptible to having his will overborne. During the interview, Defendant appeared alert, intelligent, competent, and comfortable. SA Russell testified that Defendant appeared to understand his questions and did not appear to be under the influence of any substance. (Doc. 74 at p. 12–13). No evidence shows Defendant suffered from any kind of mental impairment, was too tired to proceed with the interview, or did not understand the questions being asked of him. (Ex. 1).[1]

---

[1]     Defendant claims he was confused about the age of the fictional child and expressed this uncertainty during the interview, stating he thought she was twenty years old. Defendant also claims he only wanted a massage. (Doc. 80 at p. 2). Any uncertainty Defendant may have had regarding the age of the fictional minor, or his purported intent when he responded to the ad, are questions for the trier of fact to resolve and do not render his statements involuntary.

Even if Defendant was suffering from an impairment during the interview, the agents did not behave in a coercive manner.  Although between six and eight officers participated in the arrest itself, only two officers—SA Russell and SA Barnes—attended the interview, and only SA Russell asked questions.  The recorded interview shows SA Russell spoke in a friendly tone, made no threats or promises, and did not display his firearm or physically intimidate Defendant in any way.  (Ex. 1).  The interview lasted approximately 26 minutes, and Defendant was not restrained for any portion of the interview. (Id.).  The door to the interview room was left ajar.  (Id.).  Moreover, the agents never attempted to deceive Defendant regarding his custodial status: Defendant was clearly advised of his Miranda rights, and was advised he was not free to leave at that time.  (Id. at 22:15:40).  At the end of the interview, Defendant agreed that the agents made no threats or promises, and the statements were made of his own free will.  (Id. at 22:36:15–30).

Defendant argues that the agents should have asked him "whether he felt okay," whether he had worked all day, and about the kind of work he did. (Doc. 80 at p. 4).  Defendant claims that when he was interrogated, "the interrogating officers knew nothing about him."  (Id.).  Even if Defendant's qualms with the interview process had any bearing on whether the agents behaved in a coercive manner, the record shows that SA Russell did in fact ask Defendant about his workplace and background.  (Ex. 1 at 22:12:30–22:15:40). No evidence shows coercive activity by the agents, and Defendant himself stated the agents made no threats or promises.  "[I]t is illogical to conclude that

11

[Defendant] was motivated to confess by such promises if he did not himself acknowledge that they were made." <u>Brave Heart</u>, 397 F.3d at 1041.  For these reasons, Defendant's statements were voluntarily given, and the court recommends Defendant's motion be denied on this point.

## II.     Whether the evidence found in the vehicle should be suppressed

Defendant argues law enforcement should have obtained a warrant before searching his vehicle, and the inventory search conducted after his arrest was invalid.  (Doc. 64 at p. 2; Doc. 80 at p. 5–9).  The government responds the inventory search was lawfully conducted pursuant to DCI policy; additionally, the cell phone, condoms, and $200 cash were in plain view within the passenger compartment of the vehicle.  (Doc. 77 at p. 7–8).

### A.     Law enforcement did not conduct a valid inventory search

A Fourth Amendment search occurs "when the government violates a subjective expectation of privacy that society recognizes as reasonable." <u>Kyllo v. United States</u>, 533 U.S. 27, 33 (2001).  The "cardinal principle" in Fourth Amendment search and seizure jurisprudence is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." <u>Mincey v. Arizona</u>, 437 U.S. 385, 390 (1978) (quoting <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967) (footnotes omitted)).  When the government seeks to introduce evidence that was seized during a warrantless search, it bears the burden of showing that an

exception to the warrant requirement applies.  Mincey, 437 U.S. at 391 (citing Vale v. Louisiana, 399 U.S. 30, 34 (1970)).

Inventory searches are one of the "well-defined exceptions" to the Fourth Amendment's warrant requirement.  Colorado v. Bertine, 479 U.S. 367, 371 (1987).  This exception "permits law enforcement to inventory the contents of a vehicle that is lawfully taken into custody, even without a warrant or probable cause to search."  United States v. Garreau, 658 F.3d 854, 857 (8th Cir. 2011).  Neither a warrant nor probable cause is necessary because officers "are not investigating a crime; instead they are 'performing an administrative or care-taking function.'"  United States v. Rowland, 341 F.3d 774, 779 (8th Cir. 2003) (quoting United States v. Marshall, 986 F.2d 1171, 1174 (8th Cir. 1993)).  The routine practice of securing and inventorying a vehicle's contents is a "response to three distinct needs: the protection of the [vehicle] owner's property while it remains in police custody; the protection of the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger."  South Dakota v. Opperman, 428 U.S. 364, 369 (1976).

Inventory searches must be reasonable under the circumstances.  Rowland, 341 F.2d at 779 (citing Opperman, 428 U.S. at 369).  Inventory searches that are "conducted according to standardized police procedures, which vitiate concerns of an investigatory motive or excessive discretion, are reasonable."  Id.  Standardized police procedures are necessary to "ensure that the search is not merely a ruse for general rummaging in order to discover incriminating evidence."  Id.  (internal quotations and citation omitted).

13

However, the Eighth Circuit has established that the government need not
introduce the written policy into evidence for an inventory search to be valid.
United States v. Lowe, 9 F.3d 43, 46 (8th Cir. 1993).  Law enforcement
testimony describing the department's standardized procedure sufficiently
establishes that the procedure exists.  (Id.).

Here, the government did not offer DCI's inventory search procedure as
an exhibit.  However, Det. Stauffacher testified that DCI procedure requires
officers to tow and impound a vehicle and conduct an inventory search when
the sole occupant of the vehicle has been arrested.  (Doc. 74 at p. 59–60).  Det.
Stauffacher testified that the procedure's purpose is to document valuables
and ensure law enforcement is not held accountable if something goes missing
during the tow.  (Id. at p. 60).   SA Gromer testified that DCI's procedure is to
conduct an inventory search on an arrestee's vehicle and note all contents of
the vehicle in an inventory.  (Id. at p. 65).  SA Gromer stated that the inventory
search's purpose is to confirm the contents of the vehicle for law enforcement's
protection and for the owner's protection.  (Id. at p. 74–75).   The court finds
that this testimony sufficiently establishes that DCI employs a standardized
inventory search procedure.  See Lowe, 9 F.3d at 46.

However, the officer testimony does not establish that law enforcement
followed DCI's inventory search procedure.  DCI's procedure requires the
searching officers to note the contents of the vehicle in an inventory.  (Doc. 74
at p. 65).   The court understands this testimony to mean the officers must
create a written inventory.  The government introduced no evidence showing

14

that any kind of written inventory was completed.  Det. Stauffacher testified

that he photographed the interior of the vehicle; given the limited testimony on

DCI's procedure, and the lack of evidence concerning the extent of the

photographs, the court cannot find that photographs comply with the

procedure's requirements.  See Rowland, 341 F.3d at 779–80 (finding that

officer testimony on "unwritten" inventory search policy does not alter or

override written policy).  By failing to create a written inventory, law

enforcement failed to follow its own inventory search policy "and thus did not

conduct the search pursuant to 'standardized police procedures.'"  Id. at 780

(quoting Opperman, 428 U.S. at 376).  However, this does not dispose of the

issue.

　　"Even when law enforcement fails to conduct a search according to

standardized procedures, this does not mandate the suppression of the

evidence discovered as a result of the search."  Id. (citing United States v.

Mayfield, 161 F.3d 1143, 1145 (8th Cir. 1998)).  "Compliance with procedures

merely tends to ensure the intrusion is limited to carrying out the government's

care-taking function."  Id. (quoting Mayfield, 161 F.3d at 1145).  "There must

be something else; something to suggest the police raised 'the inventory-search

banner in an after-the-fact attempt to justify' a simple investigatory search for

incriminating evidence."  Id. (quoting Marshall, 986 F.2d at 1175).  "Here there

is something else."  Id.

　　An investigatory motive, on its own, does not invalidate an inventory

search.  Id. (citing Marshall, 986 at 1175–76.  "That an officer suspects he

might uncover evidence in a vehicle . . . does not preclude the police from towing a vehicle and inventorying the contents, as long as the impoundment is otherwise valid." United States v. Petty, 367 F.3d 1013, 1009 (8th Cir. 2004) (citing United States v. Garner, 181 F.3d 988, 991–92 (8th Cir. 1999); see United States v. Porter, 859 F.2d 83, 85 (8th Cir. 1988) ("[A]n officer's suspicion that evidence may be present does not invalidate an otherwise lawful inventory search."). Here, however, the government fails to show this was anything other than a search for evidence.

Law enforcement searched Defendant's vehicle with a plainly investigatory motive. Neither Det. Stauffacher nor SA Gromer testified that their subjective intent in the search was to document Defendant's personal property in case of theft. Det. Stauffacher testified that his purpose at the scene was "[t]o assist with the takedown and to collect the evidence and photograph." (Doc. 74 at p. 61). He stated his typical role at an arrest scene is to "take photographs and document and collect anything of evidentiary value." (Id. at p. 55). Before the arrest, Det. Stauffacher learned he would be looking for physical evidence in the form of $200 in cash and a condom. (Id. at p. 55). SA Gromer testified that he was aware physical evidence would be found in the car, including condoms, money, and cell photos or other internet-capable devices. (Id. at p. 66). Det. Stauffacher agreed with defense counsel that he was "instructed . . . to gather the evidence in the case as soon as the arrest took place." (Id. at p. 62). Det. Stauffacher found the condoms and $200 almost immediately after beginning the search, and found one cell phone on

16

the passenger-side floorboard and the other cell phone in the closed center console.  (Id. at p. 56–58).  He testified that the evidentiary value of those items was immediately apparent.  (Id. at p. 60).  He stated he also searched the backseat and the trunk, but did not find anything of evidentiary value there.  (Id. at p. 57).  The officers' investigatory motive, considered on its own, is not enough to "sour an inventory search."  Rowland, 341 F.3d at 780.  However, this motive, and the government's failure to introduce evidence of either any written inventory or the inventory policy, concerns the court.  See id.

The government bears the burden of proving law enforcement conducted a valid inventory search.  Mincey, 437 U.S. at 391.  Here, the government has not met that burden.  While the government has proven that DCI employs a standardized inventory search procedure, no evidence shows that law enforcement conducted a reasonable inventory search here.  Lowe, 9 F.3d at 46.  The purpose of the DCI procedure, according to the testimony at the evidentiary hearing, is to preserve the arrestee's personal property and protect law enforcement in case of theft.  (Doc. 74 at p. 60, 74–75).  No evidence shows Det. Stauffacher documented other items typically found in a car, such as phone chargers, CDs, or coins, which may be more monetarily valuable than items such as a condom but have less evidentiary use.  From the evidence presented at the suppression hearing, it appears law enforcement solely noted items of evidentiary value, and did not compile any kind of written inventory.  The purpose of the search was to find evidence.  (Id. at p. 55, 61–62).  The government has failed to meet its burden to show this was anything other than

17

an investigatory search.    However, for the reasons stated in the following

section, the physical evidence obtained from the vehicle should not be

suppressed.

### B.    Law enforcement conducted a valid search incident to arrest

Under the circumstances, a valid basis existed for a search incident to

arrest under Arizona v. Gant, 556 U.S. 332 (2009).  The Supreme Court's

holding in Gant "confined the applicability of the search-incident-to-arrest

exception to two situations."  United States v. Davis, 569 F.3d 813, 816 (8th

Cir. 2009).  Under the search incident to arrest exception, "officers may search

a vehicle incident to an arrest only if (1) the arrestee is unrestrained and

'within reaching distance of the passenger compartment' when the search

begins or (2) 'it is reasonable to believe the vehicle contains evidence of the

offense of arrest.'"  United States v. Stegall, 850 F.3d 981, 984 (8th Cir. 2017)

(quoting Gant, 556 U.S. at 351); see United States v. Valandra, No. Cr. 11-

30010-RAL, 2011 WL 3439919, at *10 (D.S.D. Aug. 5, 2011) (upholding vehicle

search for items related to Defendant's intoxication as a valid search incident

to arrest even though inventory search was invalid).

"Under the second Gant exception, officers may conduct a warrantless

search of a vehicle incident to arrest—even after the arrestee is restrained in

the back of a patrol vehicle—when officers have a reasonable basis to believe

the vehicle contains evidence related to the crime of arrest."  Stegall, 850 F.3d

at 984 (citing Gant, 556 U.S. at 381; United States v. Allen, 713 F.3d 382, 387

(8th Cir. 2013)) (upholding search of hatchback area of car, even though

18

defendant was restrained in patrol car, because officers "reasonably believed" the car might contain evidence relevant to defendant's arrest for terroristic threatening).

Here, based on SA Russell's texting conversation with Defendant, law enforcement reasonably believed evidence of attempted enticement of a minor using the internet, specifically condoms, $200 in cash, and cell phones, would be found in the vehicle.  Defendant identified the car he would be driving, and arrived at the Flying J at the agreed-to meeting time.  The arrest team was aware Defendant would bring $200 to pay for the sexual encounter, and a condom.  (Doc. 74 at p. 6–7, 10–11, 55); Stegall, 850 F.3d at 984.  Based on these facts, law enforcement reasonably believed evidence of attempted enticement of a minor—cell phone, condoms, and $200—would be found in the vehicle.  See Stegall, 850 F.3d at 984.  The cell phone, condoms, and $200 were all found within the passenger compartment of the vehicle.  (Doc. 74 at p. 56–57).  Because law enforcement searched the vehicle pursuant to a valid Fourth Amendment exception, Defendant's motion to suppress evidence found in the vehicle should be denied.

**III.    Warrantless search of cell phone**

Defendant argues SA Gromer violated the Fourth Amendment when he found Defendant's cell phone, powered it on, and observed the text messages without a warrant.  (Doc. 80 at p. 5).  The government responds that law enforcement inevitably would have discovered the text messages because

19

agents later received a valid, independent search warrant for the phones.  (Doc. 70 at p. 8).

### A.    Opening the phone violated the Fourth Amendment

As stated above, one "exception to the warrant requirement is a 'search incident to a lawful arrest.'"  Schaffer v. Beringer, 842 F.3d 585, 593 (8th Cir. 2016) (quoting Gant, 556 U.S. at 338).  The court found previously that Defendant's phones were lawfully seized during a search incident to arrest. However, the nature of the item being searched affects the scope of law enforcement's post-arrest search of the item:

> Once seized, most items do not give rise to a separate Fourth Amendment search inquiry.  Think of a firearm or a marijuana plant. The evidentiary value of those items is the object itself, so seizing them is all law enforcement needs to do.  Some items, however, conceal other items.  Even when law enforcement lawfully seizes a suitcase, for example, it still needs a warrant . . . to open it.  That is because, in addition to the Fourth Amendment possessory interest a person has in a suitcase, there is an additional Fourth Amendment privacy interest in its contents.

United States v. Curaba, No. 5:14-cr-50065-JLV, Doc. 96, at p. 5–6 (D.S.D. Feb. 2, 2018) (quoting United States v. Turner, 839 F.3d 429, 434 (5th Cir. 2016)).

In Riley v. California, the Supreme Court held that "searching a cell phone seized incident to an arrest" generally requires a warrant because of the massive privacy interests associated with the contents of a phone.  573 U.S. 373, 403 (2014).  A person has no reasonable expectation of privacy when he voluntarily displays his cell-phone screen in the presence of law enforcement. United States v. Morgan, 842 F.3d 1070, 1075 (8th Cir. 2016).  But when law

enforcement physically manipulates a phone or otherwise tries to access the information inside, a search occurs and a warrant is required.  Curaba, Doc. 96 at p. 10; see Arizona v. Hicks, 480 U.S. 321, 324, 328–29 (1987); United States v. Bell, No. 15-10029, 2016 WL 1588098 at *3 (C.D. Ill. Apr. 20, 2016) (finding that opening a flip phone seized incident to arrest amounted to a search).

Although a smart phone need not be physically "opened" like a flip phone, unlocking a smart phone and opening a flip phone are functionally analogous.  Law enforcement powered on Defendant's phone, unlocked it, and proceeded to access a portion of Defendant's text messages which, under Riley, amounts to a violation of Defendant's reasonable expectation of privacy.  Riley, 573 U.S. at 403.  The government has not identified any exception to the warrant requirement that would justify the search of the phone.  For these reasons, accessing the preview of Defendant's text messages constituted a warrantless search in violation of the Fourth Amendment.  However, suppression of the phone contents is not required because law enforcement subsequently obtained a valid search warrant for the phone.

**B.  The cell phone text messages should not be suppressed**

"Where information is discovered after police violate the Fourth Amendment, the evidence should not be suppressed '[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'"  United States v. Sallis, 920 F.3d 577, 582–83 (8th Cir. 2019) (quoting Nix v. Williams, 467 U.S.

21

431, 444 (1984)).  Law enforcement applied for a warrant to search Defendant's cell phones.  (Doc. 70-1).  The magistrate judge found probable cause and issued the search warrant on August 16, 2017.  (Id.).  The affidavit in support of the search warrant did not include the acts of unlocking the cell phone and viewing the text messages to confirm Defendant's identity.  (Id. at p. 15–18). Instead, the affidavit accurately stated that Defendant admitted texting SA Russell at the August 10, 2017 interview, and stated that the phone was found in Defendant's possession.  (Id. at p. 18).  Because law enforcement ultimately lawfully searched the phones by obtaining a valid search warrant, the cell phone contents should not be suppressed.

## IV.    Warrantless arrest

In his supplemental brief, Defendant argues for the first time that he was subjected to a warrantless arrest made without sufficient probable cause. (Doc. 80 at p. 3–4).  This issue specifically was not litigated at the evidentiary hearing.  Before the government called its first witness, the court asked the parties if they needed to address any preliminary matters.  (Doc. 74 at p. 2). AUSA Collins responded that she did "not plan on establishing probable cause [for the arrest or search warrant] because that was not an issue raised by the defense[,]" and "just wanted to make sure everybody was on the same page that that was not going to be expected today."  (Doc. 74 at p. 2).  Defense counsel did not dispute probable cause for the arrest at the evidentiary hearing.  (Id. at p. 2–4).  Defendant nevertheless raised the issue of probable cause for the arrest in his supplemental brief.  (Doc. 80).  By raising this argument for the

first time in supplemental briefing, the government had no opportunity to respond or present evidence on the issue.

The request to suppress evidence based on a warrantless arrest is untimely under Fed. R. Crim. P. 12(b)(3) and the court will not now consider Defendant's argument on this point.  See Fed. R. Crim. P. 12(c)(3); see also United States v. Spotted Elk, 548 F.3d 641, 656 (8th Cir. 2008) (stating that Fed. R. Crim. P. 12's waiver provision "applies . . . to the failure to include a particular argument in the motion." (internal citations omitted)).  If Defendant wishes to raise this issue before the court, he may file a good cause statement and request permission to file a second untimely motion to suppress.  Id.  The court notes, however, that defense counsel certainly was aware at the time of the hearing that Defendant had been subjected to a warrantless arrest.  If defense counsel planned on challenging probable cause for the arrest, he could have done so in the original motion—which was filed far past the suppression motions deadline—or, at the very least, informed AUSA Collins he wished to do so when she raised the possibility at the evidentiary hearing.

## CONCLUSION

For the foregoing reasons, it is respectfully recommended that Defendant's motion to suppress be denied.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely

objections will result in the waiver of the right to appeal questions of fact.

Objections must be timely and specific in order to require *de novo* review by the

District Court.  <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black</u>,

781 F.2d 665 (8th Cir. 1986).

      DATED this 30th day of July, 2019.

                BY THE COURT:

                DANETA WOLLMANN
                United States Magistrate Judge